**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 99-14227-CIV-MOORE/GARBER

DAVID A. WARD, *et al.*,

   Plaintiffs,

v.

JOHN K. NIERLICH, *et al.*,

   Defendants.

_____/

**CLOSED
CIVIL
CASE**

## ORDER ON SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Defendants' John K. Nierlich ("Nierlich"), Richard

A. Puzzitiello Sr. ("Puzzitiello"), Carol Chandler ("Chandler"), Reserve Developers, L.L.P.

("Reserve Developers"), Park Group East, Inc. ("Park Group East"), Park Southern Builders of

Pinellas, Inc. ("Park Southern"), The Park Group Companies of America Inc. ("Park Group of

America"), and Banyon Lakes C. Corp. ("Banyon Lakes") (collectively "Defendants") Motion

for Summary Judgment (dkt # 546). Plaintiffs, David A. Ward ("Ward"), Reserve Management,

Inc. ("Reserve Management"), MMC of the Treasure Coast, Inc. ("MMC"), Reserve Realty

Sales, Inc. ("Reserve Realty Sales"), Reserve Builders, Inc. ("Reserve Builders"), and ML

Builders, Inc. ("ML Builders") (collectively "Plaintiffs") filed an Amended Response to

Defendants' Motion for Final Summary Judgment (dkt # 593). A Reply (dkt # 598) was also

filed.

   UPON CONSIDERATION of the Motion, and the pertinent portions of the record, and

being otherwise fully advised in the premises, the Court enters the following Order.

## I.    Background

Plaintiffs' cause of action has an extensive and detail dependent history that includes both a complicated procedural history, as well as a large number of different entities. Given this complexity, and Plaintiffs' previous misgivings that their action has not been comprehended, this Court will provide a comprehensive overview of the relevant background.

In or around 1991, Ward organized ML Builders, which he utilized as a general contracting company to build both single and multiple family residences. During this same period, Ward was planning and beginning to implement development of an area labeled Pod E at the Reserve Development. The Reserve is an affluent residential development, containing golf courses and amenities, located in St. Lucie County, Florida. In 1992, as part of Ward's Pod E development project, he formed Reserve Realty Sales. Reserve Realty Sales was originally created to sell ML Builders' residential structures. Again, as part of his Pod E development plan, in 1994, Ward established Reserve Builders, which would own the lots and buildings located at the Reserve. Part of the Pod E development plan called for the creation of a forty-eight unit development. Also in 1994, the Professional Golf Association ("PGA") announced that the Reserve would serve as its winter home, which increased the value and notoriety of the Reserve's real estate.

By 1995, ML Builders had built 170 single family homes and had begun construction on a forty-eight unit condominium complex located on Pod E. Also in 1995, Defendants Nierlich and Puzzitiello visited the Reserve and expressed interest in purchasing a unit. During this 1995 visit, they began asking detailed questions regarding the Reserve's development plan; consequently, Nierlich and Puzzitiello were introduced to Ward. In the course of their

2

discussions, Ward explained to Nierlich and Puzzitiello that Ward had the option of purchasing additional land at the Reserve. This additional land is referred to as Pod F.

Ward informed Nierlich and Puzzitiello that Pod F could support a 140 unit condominium complex. Ward went on to reveal that his company, Reserve Builders, possessed an option to purchase Pod F from Callaway Land & Cattle Company, Inc. ("Callaway Company"), but Reserve Builders had let this option lapse. Ward explained to Nierlich and Puzzitiello that he did not have sufficient financing to exercise the option and develop Pod F. Nierlich and Puzzitiello claimed that, through their companies, they could obtain the financing necessary to exercise the option to purchase and develop Pod F. Nierlich and Puzzitiello stated that their business, Park Group of America, was a family company worth around $30,000,000. Nierlich also mentioned that he had a development company called Bridlewood (now known as Banyon). Following the discussions between Ward and Park Group of America, represented by Nierlich and Puzzitiello, the two groups contemplated creating a partnership for the purpose of purchasing and developing Pod F.[1]

In further contemplation of the partnership, an entity, which would eventually become Reserve Developers, LLP, obtained an extension on the option to purchase the Pod F real estate from Callaway Company. The entity paid $100,000 for this option extension. After obtaining the extension, but before an official partnership was formed, Ward requested references and background information on Puzzitiello. Puzzitiello provided Ward with favorable background materials, but did not include any information about alleged lawsuits that had been filed against

---

[1] Around this time, Ward also established Reserve Management, whose purpose was to manage rentals and oversee all units controlled by Ward.

3

Puzzitiello. After receipt of the background information, Ward entered into a partnership agreement with Nierlich, Puzzitiello, and their entities.

On February 16, 1996, Park Group East, of which Puzzitiello was President and Nierlich was Vice-President, merged with MMC[2] to establish Reserve Developers LLP. The partnership agreement ("agreement") limited Ward and his companies (Reserve Management, Reserve Realty, and ML Builders) to only performing work in furtherance of the partnership, excepting any projects commenced before the partnership formation. The agreement further created a fifty-fifty split of most assets between Ward's Company MMC and Defendants' Company Park Group East. Upon establishment of Reserve Developers, the partnership began developing a strategy to finance the Pod F acquisition.

Nierlich and Puzzitiello explained to Ward that in order to obtain one hundred percent financing for the acquisition of Pod F they needed to pass the property through an independent entity at a substantial mark up. Bridlewood was chosen as the independent entity through which the Pod F real estate would be passed. Accordingly, Reserve Builders[3] assigned the option to purchase Pod F to Bridlewood with the understanding that following Bridlewood's acquisition of Pod F, Bridlewood would sell Pod F to Reserve Developers at an inflated price. Bridlewood, without Plaintiffs' knowledge, signed a consulting agreement with Parkview Corporation.

---

[2] Ward created MMC as an entity for the express purpose of joining the partnership and developing Pod F.

[3] Although Reserve Builders assigned the option, this assignment was apparently in error as Reserve Builders no longer possessed an option to assign. Reserve Developers had ownership over this option pursuant to its February 1, 1996 extension of contract agreement with Callaway. Therefore, Reserve Developers, not Reserve Builders, should have been the entity that assigned the option to purchase to Bridlewood.

4

Parkview Corporation was a consulting company headed by Puzzitiello, who was also president

of Park Group East, which represented the non-Ward portion of the Reserve Developers

partnership.  Bridlewood also paid Puzzitiello's Parkview Corporation $227,000 for its advice as

to whether Bridlewood should purchase and develop Pod F.  The consulting agreement was

entered into despite the fact that Reserve Developers, not Bridlewood, already had a contract to

purchase Pod F from Callaway for $1,815,000.  In furtherance of their financing scheme,

Bridlewood entered into a sales contract with Reserve Developers whereby Bridlewood would

sell Pod F to Reserve Developers for $2,275,000.  This was done, according to Nierlich and

Puzzitiello, to obtain greater financing, since Reserve Developers already had the right to

purchase Pod F for $1,815,000.  Nierlich and Puzzitiello promised that the $460,000 Pod F

markup would be split fifty-fifty among the partnership.  Following the financing scheme, on

April 26, 1996, Ohio Savings Bank issued a loan of $6,972,000[4] to Nierlich and Park Group of

America.

On April 25, 1996, Bridlewood closed with Callaway for purchase of Pod F, paying the

original, uninflated amount of $1,815,000.  Approximately four months later, Bridlewood

executed a warranty deed to Reserve Developers, but the deed only transferred  the Pod F real

estate and not additional land purchase options that were obtained from Callaway, which

Plaintiffs' argue should have gone to the partnership.  Upon receipt of Pod F, Nierlich and

Puzzitiello allegedly inflated the value of Pod F a second time to a value of $2,405,000, which

served to reduce future profits of the partnership.  Ward also argues that Nierlich and Puzzitiello

took advantage of him during the Pod F acquisition because Nierlich took a brokers fee of

_____

[4]This amount was later increased to $8,972,000.

5

$50,000, retained 1.5 acres of land for a sales center rather than making it a partnership asset, and exercised dominion over additional land purchase options from Callaway.

Following the acquisition of Pod F, Plaintiffs argue that Defendants began to wrest control over all of Plaintiffs' companies and failed to repay those same companies for expenditures made to benefit the partnership. Reserve Realty Sales, a Ward company, expended resources and money to create advertising and marketing for Pod F. Reserve Realty Sales also paid for all sales expenses. These expenditures were made for the benefit of Reserve Developers (the partnership) and Plaintiffs believe that Reserve Realty Sales should have been reimbursed. Nierlich and Puzzitiello allegedly insisted that Reserve Realty Sales expend more money for marketing, and Puzzitiello even made payable on demand loans to keep that company afloat. Ward maintains that Bridlewood's transfer of Pod F to Reserve Developers should have left the partnership with ample liquidity, making Puzzitiello's loans unnecessary and just another method that Defendants used to diminish Ward's businesses.[5]

Further, Plaintiffs allege that Nierlich and Puzzitiello started engaging in activities to force Ward out of the partnership. First, Nierlich and Puzzitiello, allegedly artificially increased the cost of Pod F site development and then performed non-existent phantom work to draw down on the Ohio Savings Bank loan. Second, Ward's Company, ML Builders, spent approximately $50,000 on furnishings for Pod F and Reserve Developers never reimbursed ML Builders for this expense. Third, in 1997, Nierlich and Puzzitiello began acquiring information from Ward about additional operations at the Reserve. The two Defendants would have meetings in Ohio and

---

[5] Reserve Management, another Ward Company, was also absorbed by a Defendant company. Reserve Management was having difficulty maintaining sufficient liquidity to reimburse the owners of its condominiums for the rental fees that they were due.

make requests for information from Plaintiffs in Florida. Around this same time, Ward and
Reserve Developers were named in a lawsuit ("Donahue Lawsuit").

The Donahue lawsuit named both Ward and Reserve Developers, but Ward alleges that
Nierlich and Puzzitiello allegedly managed to turn their mutual counsel against Ward.[6] During
this lawsuit, Nierlich approached Ward with two documents that demanded unconscionable
concessions. One day later, February 27, 1997, Ward copied the demands, but refused to sign the
documents given their unilateral nature. During the following March, Nierlich and Puzzitiello
continued to pressure Ward to leave the Reserve Developers partnership, so that they could reap
the development's profit. They enhanced this pressure by offering to buy Ward out for an
amount just large enough to cover the costs of his sales, marketing, and building expenses. Ward
maintains he was entitled to have these expenses reimbursed immediately by the partnership in
any event.[7] The threats, however, moved from economic to verbal affronts when on March 11,
Puzzitiello called Ward's son Matthew and threatened him. In addition, Ward's lawyer, Mr.
Reich, explained to Ward that there could be serious consequences if Ward did not settle and
relinquish his interest in Reserve Developers. Ward's relationship deteriorated to such a level
that Mr. Reich, Nierlich, and Puzzitiello did not allow him to participate in the Donahue
litigation despite Ward's status as a partner in Reserve Developers.

Under these circumstances, Ward felt compelled to sign a settlement agreement with
Reserve Developers. On March 14, 1997, Ward signed the settlement agreement. The

---

[6]Ward states that Nierlich and Puzzitiello also under represented the partnership equity in
an effort to get Ward to acquiesce into leaving the partnership.

[7]Defendants argue that Ward was not to be reimbursed immediately because their
partnership agreement did not require immediate compensation.

7

agreement required Ward to relinquish the entirety of his partnership interest. MMC (the Ward half of the partnership) was forced out of the partnership and replaced with a Nierlich controlled entity: Park Southern. The remainder of the agreement mandated that Ward would receive a 1.5% commission on future Pod F sales, but that the first $1,600 of each commission would go to the Donahue's (as part of their settlement) up to 100 units. Nierlich and Puzzitiello now appear to maintain that the settlement agreement was actually global in nature and requires Ward to give up all of the previous monies owed by Reserve Developers. The agreement provided that all prior agreements between Matthew A. Ward, David Ward, ML Builders, and Reserve Management, were terminated. Given this language, it is unclear whether the agreement was to have a retroactive effect and cancel all previously incurred debts. Ward maintains that the agreement did not apply retroactively and cites as evidence the existence of a "T-sheet" that was to reimburse Ward and his companies for initial outlays that they made. Following execution of the settlement agreement, Nierlich and Puzzitiello began to pressure  the remaining Ward companies, Reserve Realty and Reserve Management, out of the Reserve.

Nierlich and Puzzitiello created the entity Park Group Realty, which was designed to compete against Reserve Realty for housing sales at the Reserve. Park Group Realty, however, began to utilize Reserve Realty's copyrighted sales materials, which detrimentally affected Reserve Realty's ability to compete. Next, Reserve Developers, now without any Ward component, claimed ownership of the architectural designs and building plans for the Reserve's model golf villas.  Ward, nevertheless, appears to claim that his companies retained the intellectual property or copyright to the designs following the dissolution of the partnership. Third, Nierlich and Puzzitiello allegedly began hiring Reserve Management employees in an

effort to cripple Ward's remaining company still in business at the Reserve. Specifically, Defendant Carol Chandler, had formerly been Reserve Management's office manager, but she resigned and became employed with Park Realty. Chandler had access to Reserve Management's sales and customer information as well as all of Reserve Management's forms, business practices, and development information. Nierlich and Puzzitiello used many of Reserve Management's forms and simply replaced Ward's information with their own. Nierlich and Puzzitiello also lured Reserve Management customers to their company by claiming that they represented the new management group at the Reserve. In addition to competing with Ward's businesses, Nierlich and Puzzitiello also allegedly started personally interfering with Ward and his son Matthew.

Ward next claims that Nierlich aided a criminal prosecution against Ward. The prosecution originated from the management of the Reserve's Pod E. In managing Pod E, Ward would retain money received for Pod E rentals, but would then reimburse the owners of the units once per quarter. Around the time the rental receipts became due, Ward requested the funds he and his companies were allegedly owed under the Donahue settlement. Nierlich and Puzzitiello refused to pay the funds to Ward. As a result of the default, state criminal action was instituted against Ward. Ward believes that all of this was done in an effort to ruin Ward's reputation and prevent him from remaining a competitor in the Reserve. Eventually the state criminal charges were dropped.[8]

---

[8] Nierlich and Puzzitiello helped form a criminal charge against Matthew Ward that charged him with filing a false lien on Pod F construction. These charges were also eventually dropped, but the litigation was costly, distracting, and served to further hamper Ward's efforts at keeping his operation afloat.

As a consequence of Nierlich and Puzzitiello's actions in carrying out their alleged scheme, Plaintiffs claim that Defendants nefariously caused Reserve Management, Reserve Realty, and ML Builders to fail and go out of business. Further, that Defendants ruined the Ward family's reputation. From these facts as stated, Plaintiffs claim that Defendants engaged in behavior that violated 18 U.S.C. §1962(a)[9] [Count I], §1962(b) [Count II], §1962(c) [Count III], §1962(d) [Count IV], F.S. §772.103(1)[10] [Count V], §772.103(2) [Count VI], §772.103(3) [Count VII], § 772.103(4) [Count VIII], F.S. §817.034 "Florida Communications Fraud Act" [Count IX][11], Common Law Fraud [Count X], Negligent Misrepresentation [Count XI], Interference with Contract [Count XII], Unjust Enrichment [Count XIII], F.S. §620 Breach of Fiduciary Duty [Count XIV], F.S. §688.001 Misappropriation of Trade Secrets [Count XV], Conversion [Count XVI], Unfair Competition [XVII], and Defamation and Defamation Per Se [Count XVIII].

## II.    Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 "Federal Question" jurisdiction. Counts I-IV of Plaintiffs' cause of action arise under federal law, specifically 18 U.S.C. §1961. The remaining counts, V-VIII, are pendent state law claims, which arise under the laws of the State of Florida. If this Court dismisses Plaintiffs' federal law claims,

---

[9]18 U.S.C. §1962 is the Federal Racketeer Influenced Corrupt Organizations Act "RICO" statute, which forms the basis of Counts I-IV of Plaintiffs' Complaint.

[10]Florida Statute §772.103 is the Florida law that prohibits racketeering activity and is often referred to as "Little RICO." Plaintiffs allege violations under Little RICO in Counts V-VIII of their Complaint.

[11]Counts IX-XVIII represent Plaintiffs' non-RICO state law claims.

10

it is within the Court's discretion to choose not to exercise jurisdiction over the pendent state law
claims.

## III.    Standard of Review

The applicable standard for reviewing a summary judgment motion is unambiguously
stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file, together
> with the affidavits, if any, show that there is no genuine issue as to any
> material fact and that the moving party is entitled to judgment as a
> matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact.

Twiss v. Kury, 25 F.3d 1551, 1554 (11th Cir. 1994). The moving party has the burden of

meeting this exacting standard. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). An

issue of fact is "material" if it is a legal element of the claim under the applicable substantive law

which might affect the outcome of the case. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th

Cir. 1997). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find

for the nonmoving party. Id.

In applying this standard, the district court must view the evidence and all factual

inferences therefrom in the light most favorable to the party opposing the motion. Id. However,

the nonmoving party:

> may not rest upon the mere allegations or denials of the adverse party's
> pleading, but the adverse party's response, by affidavits or as otherwise
> provided in this rule, must set forth specific facts showing that there is a
> genuine issue for trial.

Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the

[nonmovant's] position will be insufficient; there must be evidence on which the jury could

11

reasonably find for the [nonmovant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## IV.   Discussion

Defendants rest their motion for summary judgment on six separate arguments.  First, Defendants argue that Plaintiffs lack standing to sue for RICO claims.

### A.   Standing: Financial Institution Fraud Predicate Act

The Racketeer Influenced and Corrupt Organizations Act ("RICO") prohibits individuals from engaging in a pattern of racketeering activity that derives income, results in an interest in any enterprise that affects interstate commerce, creates an enterprise through a pattern of racketeering activity, or conspires in violation of the aforementioned prohibited behavior.  18 U.S.C. § 1962.  RICO § 1961(1)(B) provides a litany of predicate acts that if committed and meet relatedness and continuity requirements, constitute racketeering activity.  Specifically, violation of 18 U.S.C. § 1341 mail fraud, § 1343 wire fraud, and § 1344 financial institution fraud are a few of the predicate acts listed.  The Federal Civil cause of action results from § 1964 and states

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

RICO 18 U.S.C. § 1964(c) (2006).  Section 1964 also establishes the four fundamental RICO standing requirements: (1) a person, (2) who has sustained an injury, (3) to his business or property, (4) by reason of a violation of § 1962.  The Supreme Court articulated the injury requirement and its relationship to the predicate act, which is at specific issue here, as follows: "the compensable injury necessarily is the harm caused by predicate acts." Sedima, S.P.R.L. v.

12

Imrex Co., Inc., 473 U.S. 479 (1985).  Plaintiffs claim that Defendants violated RICO and assert mail fraud, wire fraud, financial institution fraud, extortion, interstate travel to aid in racketeering, interstate transportation of stolen goods, and interstate receipt of stolen goods, as the injury causing acts in violation of § 1962 ("predicate acts").

Defendants initiate their motion by stating that Plaintiffs lack standing to allege financial institution fraud.  In order to utilize an action as a predicate act, the alleged violation must have proximately caused the injury upon which the complaint is made.  See Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (1991); see also Corporate Healthcare Financing v. BCI Holdings, 444 F. Supp.2d 423, 433 (D. Md. 2006) (holding that proximate causation is a part of the RICO standing inquiry).  Further, the Supreme Court stated "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries . . .. [Further], [t]he requirement of direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims."  Anza at 460.

Here, Defendant argues that Plaintiffs cannot maintain the predicate RICO violation of financial institution fraud because any alleged financial institution fraud would directly harm Ohio Savings, not Plaintiffs.  In this case, Plaintiff complains that the alleged financial institution fraud caused his businesses financial injury.  The injury, however, came from the actions Defendants took upon receipt of the funds.  The inflated Pod F purchase price put Ohio Savings at risk, not Plaintiffs.  The injury to Plaintiff, the siphoning off of partnership assets and the failure to share the increased capital with Ward are all actions taken by Defendants after receipt of the loan. Plaintiffs' claims in this regard are against Defendants for breach of duty and/or fraud, not

13

financial institution fraud; it was these actions that led directly Plaintiffs claimed injuries.

Defendants' actions in allocating the funds received and not sharing equally in the funds obtained

are the causes of Plaintiffs' alleged injury. Financial institution fraud may have allowed for the

receipt of the funds, but that merely created access to the instrumentality that Defendants later

employed to injure Plaintiffs. Financial institution fraud was not the proximate cause of any

alleged injury. Thus, the injury prong of the standing requirement is not met because the alleged

predicate act did not cause the violation. Further, as the Supreme Court held in Anza, Ohio

Savings Bank can vindicate any financial institution fraud through the pursuit of its own claim

against Defendants. Therefore, financial institution fraud cannot serve as a predicate act for

Defendants RICO violations.

### B.      Standing: Mail and Wire Fraud

Defendants next contend that Plaintiffs' predicate act claims of mail and wire fraud must

fail because they are really only breach of contract claims. A violation of 18 U.S.C. §§1341 and

1344 requires that Defendants "(1) intentionally participated in a scheme to defraud another of

money or property and (2) used the mails or wires in furtherance of that scheme." Sikes v.

Teleline, Inc., 281 F.3d 1350, 1360 (11th Cir. 2002). Defendants' Motion, in its attempt to prove

there is no genuine issue of material fact relating to mail or wire fraud, argues that no fraud

occurred, but rather Ward simply did not agree with the written terms of the partnership

agreement. Defendants contentions surrounding oral modification of a written agreement may

contain merit, but they misrepresent at least Plaintiffs' allegations of fraud. Plaintiffs allege

Defendants infiltrated Plaintiffs' businesses by utilizing the mails and wires.

Plaintiffs allege sufficient evidence to maintain that there is a genuine issue of material

14

fact as to whether Defendants intentionally defrauded Plaintiffs of money or property using the mails or wires in furtherance. First, Plaintiffs allege that as part of the fraud, Defendants sent a fax regarding a brokerage fee that was to be paid to Nierlich's company, Bridlewood, as compensation for finding financing for the Pod F purchase. See Pl. Ex. 3 [Ward Affidavit] at ¶9. Plaintiffs, however, maintain that Puzzitiello actually financed the purchase, which according to Plaintiffs was Puzzitiello's role in the partnership. Plaintiff claims that had he not been defrauded regarding the origin of the financing he would not have agreed to pay Nierlich's company the $50,550 finders fee. See Id. Plaintiffs' reliance on this alleged misrepresentation pushed plaintiff into authorizing a payment that diminished partnership assets that he, as a partner, might have been entitled to and left the partnership less secure.

Second, Plaintiffs' claim that Defendants transferred, by wire, $227,500 of partnership loan proceeds to Puzzitiello's Parkview Corporation. Id. at ¶13. Ward, as a general partner of Reserve Developers, claims that he should have had knowledge and/or a share of the transfer of partnership assets to Puzzitiello. Id. This shielding of partnership assets from Plaintiffs removed equity that might have been due to the partnership and injured Plaintiffs because when Plaintiffs requested allocation of partnership funds, Plaintiff was informed that not enough money existed. This $227,500 could have provided the needed funds to keep the partnership and its projects profitable.

Third, Plaintiffs provide evidence that on January 10, 1997, Puzzitiello sent a letter to Ward demanding that he provide additional information to Defendants and include "full disclosure of all aspects of your operations at the Reserve." Pl. Ex. 77 [Letter from Puzzitiello to Ward] at 2. This letter requires Plaintiffs to provide complete disclosure regarding their

15

businesses. Throughout the letter, Defendants request Ward's business information and state that the condo sales must meet a certain threshold. Id. at 1-5. In examining the letter, it appears nothing more than the firm warning of a concerned business partner, but based in the light most favorable to the Plaintiffs, the letter does appear to request information that Defendants could then use to defraud Plaintiffs of their businesses.

Fourth, following Plaintiffs' withdrawal from Reserve Developers, Defendants transmitted letters through the mail to condominium owners in both Pod E and Pod F explaining that their company Park Group Realty would "be the new management company here at Golf Villas at the Reserve." Pl. Ex. 91. Again, this letter appears innocuous by itself, but in the light most favorable to Plaintiffs, the letter insinuates that Park Group Realty is replacing Reserve Management, when in fact, Park Group Realty was a Reserve Management competitor, not a replacement.

The previously stated four examples do not necessarily represent all of the possible instances of wire and mail fraud, but as Plaintiffs simply parenthetically listed exhibits that purportedly reveal mail and wire fraud, the Court was forced to sift through this un-annotated list and determine what could reasonably be considered an example of mail or wire fraud.[12] These examples do create a genuine issue of material fact as to whether Defendants committed the underlying predicate acts of mail and wire fraud.

### C.    Elements of RICO Cause of Action: Pattern of Racketeering Activity, Existence of Close Ended Continuity

---

[12]A number of Plaintiffs' listed examples of fraud [in the form of exhibits] were struck by Magistrate Garber's order (dkt # 652). In addition, Plaintiffs' allegations relating to financial institution fraud are now moot and cannot serve as predicate acts because this Court found Plaintiffs lack standing to allege financial institution fraud.

As Defendants correctly state, a violation of RICO §1962 requires the plaintiff to prove "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, 473 U.S. at 496. The Eleventh Circuit, under guidance from the Supreme Court's limited RICO jurisprudence, delineated what is necessary to prove "the pattern of racketeering activity" element of RICO. U.S. v. Browne, 505 F.3d 1229 (11th Cir. 2007). To establish a pattern of racketeering activity, Plaintiff must establish that the predicate acts were related and that they amount to a threat of continued criminal activity. See id. at 1257; see also Jackson v. Bellsouth Telecommunications, 372 F.3d 1250, 1265 (11th Cir. 2004).[13]  Further, this Circuit has held that "[t]he continuity element of a pattern of racketeering activity is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address-one that is part of a pattern of ongoing, continuing criminality." Jackson, 372 F.3d at 1265. Continuity can either be close or open-ended. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts 'extending over a few weeks or months and threatening no future criminal conduct' do not suffice." Id. at 159 (quoting H.J.Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 242 (1989).

Here, Defendants argue that Plaintiffs' predicate act allegations do not satisfy RICO's

---

[13]The Supreme Court cautioned lower courts engaging in the continuity analysis that "the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a "pattern of racketeering activity" exists. H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 243 (1989).

"pattern of racketeering activity' close-ended continuity requirement.[14]  Ward has alleged that

Nierlich and Puzzitiello first made contact with Plaintiffs in the fall of 1995 when they visited the

Reserve. It allegedly became apparent during this 1995 visit that Nierlich and Puzzitiello were

interested in becoming investors at the Reserve.  It is debatable whether this initial visit represents

the beginning of Defendants' scheme to defraud Plaintiffs of their companies, regardless,

Plaintiffs response in opposition does not cite this period as the beginning of the close-ended

continuity period.  Plaintiffs identified this initial meeting as the beginning of Defendants'

information gathering about Plaintiffs' operations, but Plaintiffs have not alleged a distinct

violation that would constitute a predicate act and start of the continuity period.   Further,

Plaintiffs do not allege when this purported close-ended continuity period ends.  In their

allegations, Plaintiffs do state that as late as March 25, 1997, Defendants had committed a

predicate act of mail fraud in sending out their letter claiming to be the new management company

at the Reserve.  Therefore, based upon Plaintiffs' claims, this Court must establish the length of

the close-ended continuity period.[15]  This alleged period might have lasted for approximately

fifteen months from the fall 1995 to March, 1997.  Alternatively, since this Court has found an

absence of financial institution fraud, the continuity period may not have commenced until Spring

1996 when the first alleged act of wire fraud occurred, but this period might not have ended until

after this suit was filed, because in 1999 the Defendants allegedly instituted a state court action

---

[14]This Court agrees with Judge Paine's earlier assessment that the facts of this case do not involve an open-ended continuity scenario.  See (dkt # 186 at 8 n. 2).

[15]See Effron v. Embassy Suites, 223 F.3d 12 at 20 (1st Cir. 2000) (stating "[i]t is true that the scheme as alleged already had spanned twenty-one months, and that its exact endpoint could not be ascertained from the pleading.").

18

against Plaintiffs' attorneys in an effort to prevent Plaintiffs from pursuing their claims in Federal Court. See Pl. Compl. at ¶301. However, this latter time-frame is overly generous and hides the fact that the first alleged predicate act took place in approximately 1996 and the majority of the predicate act violations were concluded by August, 1997, a period of only nineteen months.[16] It is this lesser period that Plaintiffs have actually submitted evidence in support of rather than merely alleged in the Complaint.[17]

Regarding the substantial period of time component, the Supreme Court provided only the following guidance that was stated above regarding close-ended continuity, "[p]redicate acts extending over a few weeks or months" do not meet the requirement of a substantial period of time. The Eleventh Circuit has held that nine months was too short to constitute a substantial period of time. Jackson, 372 F.3d at 1265-66 (periods of twenty months or less held to have been insufficient to constitute a substantial period of time).

In spite of the uncertainty as to whether Plaintiffs' claims meet the substantial period of

_____

[16]Again, Plaintiffs, in their response in opposition, do not provide the court with even their alleged beginning and end of the closed-continuity period, stating only that the acts spanned "an extended period of time." In their response, Plaintiffs simply include one citation to a list of Plaintiffs' exhibits without any further explanation, parenthetical or otherwise. In reviewing these exhibits, along with the complaint, this Court attempted to approximately determine the starting and ending point of the alleged closed-ended continuity.

[17]At this juncture, the Court finds it appropriate to note that a large portion of Plaintiffs' affidavits and other exhibits proffered in opposition to summary judgment were properly struck during the discovery portion of this proceeding. In addition, a great deal of Plaintiffs' argument stems from mere allegations made in the complaint. "In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him. Thus, mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995) (internal citations omitted).

time requirement, Plaintiffs' claims fail to meet the close-ended continuity requirement. All of Defendants' alleged acts only constitute one scheme to accomplish the discrete goal of gaining control of the Reserve, and this behavior was only directed at a small, interrelated group of victims. This Circuit's precedent supports finding a lack of close-ended continuity when only one scheme is used to accomplish a discrete goal. Despite the relevance of duration in establishing close-ended continuity, the Eleventh Circuit, in its Jackson opinion, established the possibility that duration by itself might not always be enough to establish closed-ended continuity.

The Jackson court held, in a similar scenario to the one at issue [one scheme, one goal, and limited victims], that a finding of close-ended continuity is inappropriate; "in cases like this one, where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time." Jackson, 372 F.3d at 1267.[18] Again, this scenario is very similar to the one at issue in Plaintiffs' case. Defendants engaged in one scheme: to wrest control of the partnership from Ward for the purpose of controlling development and management at the Reserve, and in the process, injured a limited number of victims. Further in the Jackson opinion, the Court quotes the Third Circuit and states, "[w]e have eschewed the notion that continuity is solely a temporal concept, though duration remains the most significant factor." Id. at 1267; quoting United States v. Pelullo, 964 F.2d 193, 208 (3d Cir. 1992). The Jackson court also references Edmondson & Gallagher v. Alban Towers Tenants Assn, where, after a three year

---

[18]In Jackson, Plaintiffs' RICO claim was dismissed because the scope of the racketeering activity was narrow *and* because the time frame was only nine months. The much smaller time-line at issue in Jackson prevents the case from being directly on point, but its discussion of the relevancy of narrowness of a RICO scheme is highly relevant.

period that included fifteen predicate acts, the D.C. Circuit found that given the small number of

victims, single scheme, and one injury, the alleged acts did not demonstrate a pattern of

racketeering activity, but rather a single scheme, directed at a few victims, and resulting in a

single, distinct injury. 48 F.3d 1260, 1265 (D.C. Cir. 1995). In that case, there was a single

*discrete* injury [the prevention of a sale of a large apartment complex], whereas here there was a

single injury, removing Plaintiffs from their position as developers and managers at the Reserve,

but the injury took multiple steps to inflict. Despite this difference, the fundamental reasoning

still applies, one scheme, causing harm to a few victims, and causing one injury does not create

close-ended continuity.

     Also in its <u>Jackson</u> opinion, the Eleventh Circuit cited to <u>Efron v. Embassy Suites</u> as

support for its holding that a narrow scheme, with one goal, and limited victims does not create

closed-ended continuity. 223 F.3d 12 (1st Cir. 2000). The facts at issue in <u>Efron</u> are closely

related to this matter. There, a partner in a real estate group filed a RICO suit claiming that some

of his partners purposefully caused their joint endeavor to lose money so that the partnership

would be worth less and certain partners would eventually be forced out. <u>Efron</u>, 223 F.3d at 13.

On appeal, the First Circuit found that the case turned on whether Plaintiffs could meet the

"pattern of racketeering activity" requirement based upon an analysis of close-ended continuity.

<u>Id.</u> at 14. Under similar facts, the First Circuit found that even though there were seventeen

predicate acts of wire and mail fraud over a twenty-one month time frame, "it is not so long a

period nor are there so many predicate acts that other indicators of continuity-or the lack of them-

are without significance." <u>Id.</u> at 17. Other factors that the First Circuit suggest courts should look

to in evaluating close-ended continuity are the "number of victims, number of racketeering acts,

variety of racketeering acts, whether the injuries were distinct, complexity and size of the scheme, and nature or character of the enterprise or unlawful activity. In assessing continuity, we analyze these factors with the goal of achieving a 'natural common sense result." <u>Resolution Trust Corp. v. Stone</u> 998 F.2d 1534, 1543 (10th Cir. 1993).

Here, the number of victims is limited. The victims consist of Ward, possibly his family, and his conglomerate family companies that he or his son control. While this does not limit Defendants alleged scheme to one victim, it is correct to state that the there were only a few victims, all of which were integrally related. In addition, the number of predicate acts was not remarkable. Even based on Plaintiffs' Complaint, aside from what Plaintiffs can provide evidence for, there were only a limited number of acts of mail and wire fraud, and one possible act of extortion, and a limited number of, if any, acts of interstate travel in aid of racketeering. As this Court has already held above, Plaintiffs lack standing to complain of financial institution fraud, which further diminishes Plaintiffs' ability to complain of widespread action with multiple victims. Further, the complexity and size of the scheme was minimal. The scheme, as evidenced by Plaintiffs' Complaint, involved Nierlich, Puzzitiello and their business entities defrauding Plaintiffs of their interest in a development. The character and nature of the enterprise was that of alleged dishonest partners who breached their duties to another partner.[19] Therefore, based upon the factors listed in <u>Resolution</u>, Defendants' alleged scheme does not allow a finding of closed-ended continuity.

---

[19]Plaintiffs argue that Defendants actually engaged in multiple schemes to wrest control of the partnership, which injured multiple Plaintiffs. However, where there is one scheme to defraud, the Court, "courts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO." <u>Schlaifer Nance & Co. v. Estate of Warhol</u>, 119 F.3d 91, 98 (2d Cir. 1997).

Further, looking again to the <u>Efron</u> case, with its similar fact pattern, the First Circuit found that even when multiple predicate acts are carried out, if there are a limited number of victims who suffer from the same acts, a finding of close-ended continuity is improper:

> Although multiple related acts of deception were claimed to underlay the faxes and mailings, all allegedly were aimed at the single goal of transforming the ownership of the Partnership during its early stages. Although a RICO pattern need not have countless victims, the finite nature of the racketeering activities alleged here, together with their occurrence over a relatively modest period of time[21 months], cannot, in our view, support a jury finding of a RICO pattern under the "closed" continuity approach. Our own precedent firmly rejects RICO liability where the 'alleged racketeering acts, taken together, comprise a single effort to facilitate a single financial endeavor.'

<u>Efron</u>, 223 F.3d 18-19.  Like <u>Efron</u>, Defendants' alleged goal was to take over control of development and management at the Reserve. This constitutes one goal that took multiple steps against the same limited number of victims. Once Plaintiffs were removed as competitors at the Reserve, Defendants' alleged scheme was complete. Under similar circumstances, the <u>Efron</u> court found:

> while the complaint pleads a series of related racketeering acts and permits an inference that defendants defrauded appellant and his two partners, we agree with the district court's determination that no reasonable jury could find that these allegations establish a RICO 'pattern.' Taken together, the acts as alleged comprise a single effort, over a finite period of time, to wrest control of a particular partnership from a limited number of its partners. This cannot be a RICO violation.

<u>Id.</u> at 21.

These alleged actions, if true, are not without penalty, but they are properly brought in the form of individual claims for fraud, breach of duty, etc, as Plaintiffs have alleged in the form of state law claims. Consequently, this Court finds that Plaintiffs are unable to establish a pattern of racketeering activity because their claim fails to meet the standards for closed-ended continuity.[20]  Furthermore, this Court will not permit Plaintiffs to boot-strap their

---

[20] The Eleventh Circuit found in <u>Jackson</u> that RICO's continuity requirement serves a crucial gate keeping function, as it did in this case, by ensuring that the "crime alleged is the sort

proper state law claims "into a 'federal case' by couching the allegations in RICO statutory language. This is not the purpose for which RICO was enacted."[21]

## V. CONCLUSION

For the foregoing reasons, it is

ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment is GRANTED IN PART. It is further

ORDERED AND ADJUDGED that as Plaintiffs' claims fail to establish a pattern of racketeering activity Counts I-VIII are DISMISSED.[22] It is additionally

ORDERED AND ADJUDGED that this Court exercises its discretion to decline supplemental jurisdiction over Plaintiffs' remaining state law claims as well as Defendants' counterclaim, which are DISMISSED WITHOUT PREJUDICE. It is finally

ORDERED AND ADJUDGED that this case is CLOSED and all remaining motions not yet ruled upon are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 27th day of March, 2008.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    All Counsel of Record

---

of offense that RICO is designed to address." 372 F.3d at 1265.

[21] Robert Suris General Contractor Corp. v. New Metropolitan, 873 F.2d 1401, 1404 (11th Cir. 1989) (referred to just for the proposition that presiding Judge Scott's words, reflected in the quotation above, succinctly state why this Court must dismiss Plaintiffs' RICO claims).

[22] The following citation represents this Court's authority to dismiss Plaintiffs' state RICO claims without a duplication in analysis, Jackson v. BellSouth Telecommunications, 372 F.3d 1250, 1263-64 (holding "Because 'Florida courts often look to the Federal RICO decisions for guidance in interpreting and applying the act,' the analysis we apply to the plaintiffs' federal RICO claims is equally applicable to their state RICO claims."[internal citations omitted]).